UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHIP, LLC AND RIVER 1, LLC | CIVIL ACTION |
| VERSUS | No. 23-6815 |
| JAMESTOWN METAL MARINE SALES, INC. | SECTION: "J"(3) |

## ORDER & REASONS

Before the Court are Plaintiffs, LaShip, LLC ("LaShip") and River 1 LLC ("River 1")'s, *Motion for Partial Summary Judgment* **(Rec. Roc. 85)**, Defendant, Jamestown Metal and Marine Sales, Inc. ("Jamestown")'s, opposition (Rec. Doc. 102), and a reply (Rec. Doc. 107). Plaintiffs seek partial summary judgment on various counterclaims brought by Jamestown. Having considered the motion and legal memoranda, the record, and applicable law, the Court finds that the motion should be **GRANTED IN PART** as to Counterclaim Ten–Unjust Enrichment and **DENIED IN PART**.

## FACTS AND PROCEDURAL BACKGROUND

Buying a car means driving off the lot with confidence; building a vessel means finally setting sail—only to discover the 'finished' product is still a work in progress. This litigation arises out of a dispute related to the construction of the vessel *Viking Mississippi*, a luxury cruise vessel navigating the Mississippi River. The dispute is between the shipbuilder, LaShip, and one of many subcontractors, Jamestown. The *Viking Mississippi* is owned by River 1.

1

In January 2020, River 1 entered into a Time Charter Party (Rec. Doc. 85-4) with Viking USA, LLC ("Viking"), to charter a luxury cruise liner. It provided that River 1 was to deliver the vessel in July 2022, but did provide for "permissible delays." The Time Charter also provided a bonus to River 1 for early delivery of the vessel by April 13, 2022; however, to be eligible for the early delivery bonus, River 1 had to notify Viking by October 15, 2021, of its intent to delivery the vessel early.

River 1 then executed a Vessel Construction Contract with LaShip to construct the vessel, which required delivery in July 2022. (Rec. Doc. 85-2, at 1).

On January 17, 2020, Jamestown submitted a bid (Rec. Doc. 85-5) to supply and install the vessel's passenger cabins and certain public spaces aboard. Jamestown's bid was based, in part, on the delivery date of June 2022. In February or March 2020, LaShip accepted Jamestown's bid when it issued a purchase order.

Construction of the vessel began, but not without significant setbacks. The project experienced delays—Hurricanes Marco, Laura, Delta, and Zeta; the February 2021 Winter Storm Uri; the COVID 19 pandemic and its impacts; and Hurricane Ida—resulting in a total of 71 days of "permissible delays" under the Charter Party's force majeure provision. (Rec. Doc. 85-10, at 5).

In September 2021, LaShip, with its eye on the early delivery bonus, communicated to Jamestown that it wanted to achieve a March 2022 delivery date. Acceleration efforts began with no formal agreement between LaShip and Jamestown on accelerating construction or on-time performance at a higher price.

On October 4, 2021, River 1, hoping to earn the early delivery bonus, provided Viking the required notice of River 1's intent to deliver the vessel early on April 11, 2022, two days before the contractual early delivery date of April 13, 2022. However, on October 30, 2021, River 1 asserted its contractual rights under the Charter Party in a letter to Viking and claimed the 71 days of "permissible delays." This contractually changed the delivery date from July 2022 to September 22, 2022. (Rec. Doc. 85-10). This in turn adjusted the early delivery date from April 13, 2022 to June 23, 2022.

The vessel was not delivered by the early delivery date of June 23, 2022. River 1 lost its right to the early delivery bonus.

In August 2022, LaShip attempted delivery of the vessel to Viking before the contractual delivery date of September 22, 2022. When the vessel arrived in New Orleans, though, deficiencies remained and it was decided to deliver the vessel on September 3, 2022, in St. Paul, Minnesota. Between the attempted first delivery in August and the final delivery on September 3rd, it was all hands on deck, as crews from both Jamestown and LaShip were aboard completing outstanding or deficient work.

On September 3, 2022, River 1 delivered the vessel to Viking in St. Paul. Numerous defects with the passenger cabins were revealed when passengers came onboard during the first few cruises and reported issues such as the shower drains not working, lighting in cabins not working, and other various issues.

Following the delivery of the vessel, LaShip and Jamestown asserted various claims against one another related to the project. Jamestown claimed amounts owed on unpaid invoices, unpaid change order work, and on acceleration costs. (Rec. Docs. 85-19, 102-8). Whereas LaShip issued its invoices to Jamestown asserting amounts owed for completing Jamestown's work during the project; to provide housing for Jamestown's employees; and to remedy deficiencies discovered in Jamestown's work. (Rec. Doc. 85-1, at 10). Additionally, on August 22, 2024 (after the filing of suit), Jamestown submitted to LaShip change order requests and project impact change orders for productivity losses and expenses based on LaShip's breach of contract.[1] (Rec. Doc. 85-1, at 11).

On September 6, 2023, LaShip and River 1 filed suit against Jamestown for breach of contract and negligence in Terrebonne Parish state court. Jamestown was served on October 23, 2023. In November 2023, Jamestown removed to the Eastern District of Louisiana.

In August 2024, Jamestown filed a *Motion to Dismiss Plaintiffs' Negligence Claims* (Rec. Doc. 18) on grounds of prescription, which the Court denied without prejudice, permitting Plaintiffs to file an amended complaint. (Rec. Doc. 31). Plaintiffs filed their amended complaint; Defendants did not re-assert their motion to dismiss.

---

[1] The Court notes that Jamestown disputes that it asserted such change order requests on August 22, 2024. Jamestown asserts that such claims were asserted in its pleadings, "starting with Jamestown's Notice of Removal [Rec. Doc. 1], and thereafter, further defined in Jamestown's Original Answer, Affirmative Defense and Counterclaims [Rec. Doc. 5]." (Rec. Doc. 102, at 8).

4

Jamestown filed a *Motion for Summary Judgment* seeking dismissal with prejudice of River 1 and LaShip's damages for reputational harm. (Rec. Doc. 75). The Court granted the motion, in part, relating to the dismissal of River 1, because "River 1 [did] not oppose its dismissal" (Rec. Doc. 93, at 1). (Rec. Doc. 105). The Court denied the motion as moot, relating to LaShip's reputational harm damages, because "LaShip [had] now disclaimed seeking reputational harm damages," (Rec. Doc. 93, at 1). *Id.*

Presently before the Court is LaShip's *Motion for Partial Summary Judgment*. (Rec. Doc. 85).

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be

satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

Jamestown asserted 10 counterclaims against Plaintiffs—(1) Breach of Contract–Failure to Pay PO Invoices; (2) Claim Pursuant to Open Account Statute; (3) Breach of Contract– Failure to Pay Priced Change Orders; (4) Breach of Contract–

Failure to Pay Unpriced Change Orders; (5) Breach of Contract–Failure to Pay

Distribution, Loss of Productivity and Acceleration Costs; (6) Breach of Contract–

Failure to Properly Manage the Project; (7) Bad Faith Breach and Administration of

Contract; (8) Detrimental Reliance; (9) Quantum Meruit; and (10) Unjust

Enrichment. (Rec. Docs. 5, 39).

In its initial disclosures, Jamestown claims the following damages organized

in four categories:

(1) "Unpaid Invoices, totaling $1,260,123.77. . ."[2]

(2) "Unpaid Approved/Priced Change Orders, totaling not less than
$1,330,527.00, as invoiced to LaShip, Invoice #52925, dated February 20,
2023. . ."[3]

(3) "Unpaid Extra Directed Work, totaling. . . $4,500,000 to $5,500,000. . ."[4]

(4) "Unpaid Delay, Acceleration and Disruption Work, totaling [$9,910,187.59],
for the following impacts:"[5] ["from LaShip's alleged mismanagement of the
project causing lost productivity and increased overtime"[6]].[7]

In this instant motion, LaShip seeks summary judgment on Jamestown's

various damages and counterclaims. Specifically, LaShip seeks summary judgment

on the following:

a) Jamestown's "damages related to alleged change orders and 'project impacts'"

that claim compensation for additional work and costs relating to force majeure

---

[2] Such damages claimed by Jamestown are based on a total of twelve invoices. (Rec. Doc. 85-20, at 8).
[3] Plaintiffs assert that this forms the basis of Jamestown's "pre-lawsuit" claim. (Rec. Doc. 85-1, at 12).
[4] Plaintiffs purport "Jamestown has quantified this alleged work in 24 'change orders,' totaling $4,628,939." *Id.*
[5] (Rec. Doc. 85-20, at 9–10).
[6] Plaintiffs' summarization of Jamestown's listed impacts. (Rec. Doc. 85-1, at 12).
[7] (Rec. Doc. 85-1, at 12).

delays or "permissible delays"; in other words, Jamestown's claimed damages for breach of contract for compensation related to changes to the: (1) vessel's delivery date, (2) Monday through Friday work shift; and (3) uninterrupted sequence of construction (Rec. Doc. 85-1, at 2–3, 20) (hereinafter, collectively referred to as Jamestown's "**Breach of Contract Counterclaims**");

b) Jamestown's claimed "damages under those change orders and 'project impacts' [that] were first submitted by Jamestown [on August 22, 2024], and thus must be dismissed for Jamestown's failure to reasonably mitigate its damages by submitting those change orders at a time when they would have been paid by Viking. . ." (Rec. Doc. 85-1, at 2–3, 23) (hereinafter referred to as "**August 22, 2024 Claims**");

c) Jamestown's four non-contractual counterclaims: Counterclaim Seven—Bad Faith; Counterclaim Eight—Detrimental Reliance; Counterclaim Nine—Quantum Meruit; and Counterclaim Ten—Unjust Enrichment (hereinafter collectively referred as "**Non-Contractual Counterclaims**"); and

d) Jamestown's claim of attorney's fees under Counterclaim Two—Claim Pursuant to Open Account Statute.

(Rec. Doc. 85-1, at 2–3).

The Court will address each argument in turn.

**A. Breach of Contract Counterclaims**

First, LaShip argues for dismissal of Jamestown's Breach of Contract Counterclaims on grounds that the contract between the parties is a fixed-price

contract, and that Jamestown could *only* adjust the price based on (1) mutual agreement by the parties, (2) for additional overhead in excess of 12 months, (3) documented inflation exceeding 5% per year, or (4) for additional work outside the technical scope of work forming the basis of the quote. (Rec. Doc. 85-1, at 17). Therefore, LaShip argues Jamestown is precluded from recovering damages for change orders and project impact invoices that seek a price change based on the following terms of the contact: (1) delivery in June 2022; (2) production work to be performed on standard day shift Monday through Friday, and (3) an uninterrupted sequence of construction should be dismissed. (Rec. Doc. 85-1, at 17–19).[8]  In response, Jamestown opposes LaShip's interpretation of the contract, arguing it is not a fixed-price contract.  (Rec. Doc. 102, at 4–7).

Therefore, the first question the Court confronts is whether the parties' contract is a fixed price contract. Neither party disputes the validity of the contract, instead the parties dispute its interpretation.

Fixed price or lump sum contracts are commonly used in construction. "[A] fixed price contract is a contract where a total price [or a lump sum] is agreed upon by the parties at the outset and costs are limited to that price." *Tri-Parish Elec. Supply, Inc. v. Cypress Bend Investments, LLC*, 2012-787 (La. App. 3 Cir. 12/12/12), 105 So. 3d 1036, 1039 (citing *L.G.W., Inc. v. Redmann*, 496 So. 2d 384 (La. App. 4 Cir. 1986)). "The legal consequences of such a contract are that the builder will only

---

[8] Specifically, LaShip seeks a finding that Jamestown cannot recover damages related to twenty-four change orders and nine project impact change orders submitted to LaShip on August 22, 2024. (Rec. Doc. 85-1, at 20–22).

recover the fixed price for completion of the work, regardless of his actual costs, unless the buyer makes changes in the plans and specifications which increase the final costs." *Phillips v. Doucette and Associated Contractors, Inc.*, 17-93 (La. App. 5 Cir. 10/25/17), 229 So. 3d 667, 676–677 (citing *Allan E. Amundson, Inc. v. Hoppmeyer*, 442 So. 2d 1254, 1256 (La. App. 5 Cir. 1983)). Thus, "it is possible that the contractor's anticipated and expected profit may turn into a loss because of a low bid or the rising prices of materials and/or labor." *Semco, LLC v. Grand Ltd.*, 16-342 (La. App. 5 Cir. 5/31/17), 221 So. 3d 1004, 1035 (internal quotations and citations omitted).

In this case, there is no formal contract memorializing the parties' agreement. Instead, Jamestown's bid (Rec. Doc. 85-5), dated January 17, 2020, and LaShip's corresponding purchase order (Rec. Doc. 85-6), dated February 4, 2020, constitute the contract between the parties. The dispute surrounds the interpretation of Jamestown's bid which states, in part:

> Our price is [$21,949,099], based on the following conditions:
> - Valid for 30 days[.]
> - Prices are based on the award of all items outlined in the Technical Scope of Work (Enclosure 2).
> - Assumes delivery in June 2022, thirty (30) months after award to LaShip.
> - Assumes all work is to be accomplished at LaShip facilities in Houma, LA.
> - All production work is to be performed on standard day shift Monday through Friday.
> - Assumes an uninterrupted sequence of construction.

- We have allowed twelve months of on-site overhead. Additional time will be added cost.

- We will work with the shipyard planning group to develop a mutually agreed outfitting schedule to support the contract delivery date for each vessel.

- Engineering to commence upon receipt of order.

- Material procurement to commence upon receipt of approved engineering deliverables.

- LaShip (ECO) commits to having available space in which to manufacture the cabins and warehouse materials.

- Labor, travel expenses, meals, lodging per-diem, etc. are included in the price quoted.

- Payment terms are 10% with order, balance based on job progress billed monthly, Net 30 days. A 1.5% fee will be charged monthly for late payment.

- Excludes taxes, duties, tariffs, and fees.

- Terms to be mutually agreed, including an updated reciprocal NDA.

- We have allowed for the usual historical escalation factors in our pricing for materials and labor. We reserve the right to claim added costs should items significantly increase in cost through no fault of Jamestown beyond those factors. A documentable change in the price of an item of material or labor rate is significant when the price of an item increases more than five percent per year.

(Rec. Doc. 85-5, at 2) (cleaned up). The contract explicitly permits changes to the price based on (1) overhead exceeding twelve months; (2) documented inflation exceeding 5% per year, or (3) for additional work outside the technical scope of work. The contract does not include a force majeure provision or a "permissible delay" provision.

The Court finds that the contract is not a fixed price contract. Therefore, the Court disagrees with LaShip's position that Jamestown's is precluded from

11

recovering damages for change orders that seek a price change based on the following terms of the contact: (1) delivery in June 2022; (2) production work to be performed on standard day shift Monday through Friday, and (3) an uninterrupted sequence of construction. From a plain reading, the contract explicitly provides that the price is based on sixteen conditions— "Our price is listed in the Price Summary (Enclosure 1), **based on the following *conditions***." (emphasis added). The contract then lists a June 2022 delivery date, work performance on a standard day shift Monday through Friday, and an uninterrupted sequence of construction as three conditions out of sixteen in which the price was based on. The words of the contract are clear and explicit, leading to no absurd consequences; therefore, no further interpretation may be made in search of the parties' intent. La. Civ. Code. Ann. art. 2046. Jamestown's corporate representative, Edward "EJ" Hazard, testified that the contract's sixteen "bullet points are written explicitly to define if they don't occur that there would be a change in the scope of work," (Rec. Doc. 102-7, at 10), and that "if they were to change, then, potentially. . . there would be a reason for compensation," (*id.* at 11). The Court agrees.

The Court agrees with Jamestown's argument that accepting LaShip's interpretation of the contract would lead to absurd consequences. (Rec. Doc. 102, at 5). For instance, another condition states, "Assumes all work is to be accomplished at LaShip facilities in Houma, LA." *Id.* LaShip's contention that deviations from this condition does not permit any price adjustments would lead to an absurd consequence, because LaShip could unilaterally relocate the construction project to

anywhere in the world and Jamestown would be bound to perform its services without any price adjustment. *Id*. Jamestown is a sophisticated business—it would not have gone into such a vessel construction project based on a fixed price contract. Neither would LaShip.

Lastly, the Court finds LaShip's reliance on *Crosby Constr. Servs., Inc. v. Rigid Constructors, LLC*, No. 23-438, 2024 WL 4634057 (W.D. La. Oct. 30, 2024) is factually distinguishable from this case. In *Crosby*, the master service agreement at issue provided a change order process as well as explicitly stating "no additional amounts shall be due to Subcontractor." *Crosby Constr. Servs., Inc.*, 2024 WL 4634057, at *4. The master service agreement also provided "no compensation is due for work without a written change order authorizing such work, and that all modifications of the contract must be in writing." *Id*. at *5. Unlike the explicit and clear language in the *Crosby* master service agreement, the Jamestown–LaShip contract contains no explicit language stating no additional amounts shall be due. Further, it provides no provision governing the submission of change orders. Unlike the *Crosby* court, the Court cannot find explicit language in the parties' contract to find the parties intended a fixed price contract.

### B. "August 22, 2024" Claims

LaShip argues that "there is no genuine dispute that Jamestown cannot recover damages related to the 24 'change orders' and nine 'Project Impact change orders' first submitted to LaShip on August 22, 2024." (Rec. Doc. 85-1, at 23).

Specifically, LaShip argues "Jamestown failed to follow the ordinary course of practice between [the] parties and accordingly failed to mitigate its damages as required by Louisiana Law." *Id.* LaShip purports Jamestown failed to follow the ordinary course of practice because

> The Time Charter between River 1 and Viking. . . required Viking to fund the cost of any approved change orders made by subcontractors like Jamestown. . . a fact about which Jamestown was well aware. . . Jamestown submitted nearly 60 change orders during construction and was paid approximately $3.5 million on those change orders. This constitutes the ordinary 'course of performance' between Jamestown and LaShip because in this 'particular transaction,' (1) Jamestown repeatedly sought change orders for price adjustments, which were funded by Viking, and (2) both parties knew about and accepted this practice. [ ] This course of performance, therefore, serves as uncontradicted evidence of 'the meaning of the parties' agreement' between LaShip and Jamestown, particularly the proper procedure by which Jamestown was to pursue added costs and permissible change orders, to which the contract was otherwise silent.

(Rec. Doc. 85-1, at 24).

In response, Jamestown first disagrees with Plaintiffs' argument that LaShip first received notice of these claims on August 22, 2024. (Rec. Doc. 102, at 8). Instead, Jamestown argues these claims were asserted by Jamestown in its Notice of Removal (Rec. Doc. 1) and were further defined in its Original Answer, Affirmative Defenses and Counterclaims (Rec. Doc. 5). *Id.* Jamestown also disagrees with LaShip's "ordinary course of performance" argument. *Id.* at 9–10.

The Court finds there is a genuine issue of material fact as whether Jamestown failed to follow the ordinary course of practice between the parties and therefore

failed to mitigate its damages. Jamestown is seeking compensation for its acceleration efforts and loss of productivity. LaShip has been aware of these claims prior to August 22, 2024.

Here, it is undisputed the LaShip–Jamestown contract does not provide a change order procedure provision. Jamestown is neither a party to the Time Charter Party between River 1 and Viking, nor the Vessel Construction Contract between River 1 and LaShip. Jamestown's corporate deponent testified Jamestown did not have contemporaneous knowledge as to the contractual arrangement between Viking and River 1. (Rec. Doc. 102-7, at 4–5). Further, not all changes orders were funded by Viking. (Rec. Doc. 102, at 10–11) ("LaShip issued a new purchase order to Jamestown in the amount of $353,349 for replacement of materials damaged in the Cabin Factory [during Hurricane Ida]."). Moreover, Jamestown submitted change orders based on re-work that had to be performed after parts of the vessel had been damaged by Hurricane Ida—change orders that likely will not be paid by Viking. (Rec. Doc. 102, at 11). Whether Viking paid some or all of the change orders does not constitute the ordinary course of performance. Viking does not owe any contractual obligations to Jamestown, nor does Jamestown owe any contractual obligations to Viking. For these reasons, the Court finds that summary judgment on this issue is not warranted.

## C. Non-Contractual Counterclaims

LaShip seeks summary judgment on Jamestown's non-contractual counterclaims: Counterclaim Two–Claim Pursuant to Open Account; Counterclaim

Seven–Bad Faith Breach and Administration of Contract; Counterclaim Eight–
Detrimental Reliance; Counterclaim Nine–Quantum Meruit; and Counterclaim Ten–
Unjust Enrichment.

### i. Bad Faith

Jamestown alleges that LaShip changed the work sequence of the vessel and
induced Jamestown "to undertake acceleration measures to. . . recover schedule
delays caused by fortuitous events and attempt to achieve early delivery of the vessel
by promising to compensate [Jamestown] for such measures." (Rec. Doc. 5, at 25).
Jamestown further alleges that LaShip never intended to compensate Jamestown for
its acceleration efforts; instead, LaShip acted as if it offered and Jamestown accepted
an early delivery bonus risk. *Id.* at 26. LaShip then ceased making progress and
purchase order payments to Jamestown. *Id.* Thus, Jamestown alleges "LaShip's
intentional breach of contract, including but not limited to its refusal to pay the PO
Invoices and pay [Jamestown] in full for the cost of all work [Jamestown] performed
on the [*Viking Mississippi*] including acceleration measures, without legitimate basis,
constitutes bad faith." *Id.*

In sum, LaShip argues that there is no evidence that LaShip "breached the
contract, let alone for a sinister and morally questionable reason." (Rec. Doc. 85-1, at
25). In response, Jamestown argues sufficient evidence exists because LaShip
breached its contract when it failed to pay numerous invoices submitted by
Jamestown for "base scope work and added work" that was performed and accepted

by LaShip. (Rec. Doc. 102, at 26–27). Jamestown also argues LaShip was in bad faith because (1) LaShip's CEO made the unilateral decision to withhold payments from Jamestown; (2) LaShip did not attempt to negotiate the close out of the contract in good faith, and (3) LaShip bullied and interfered with Jamestown's exclusive supplier relationship with Staco. (Rec. Doc. 102, at 26–30).

Contracts in Louisiana must be performed in good faith. La. Civ. Code Ann. art. 1983. "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. Code Ann. art. 1997. "The term bad faith means more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives." *See e.g.*, *Benton v. Clay*, 48,245 (La. App. 2 Cir. 8/7/13), 123 So. 3d 212, 219.

Here, the Court finds a genuine issue of material fact exists on the issue of bad faith. Although there is no formal agreement relating to the parties' acceleration discussions, the exhibits to the briefing reflect that in an email, dated September 27, 2021, LaShip informed Jamestown of LaShip's "hard delivery date" of March 15, 2022; and requested Jamestown to inform LaShip of any problems that it may have to finish the vessel by that date, so that they can work together to make it happen. (Rec. Doc. 102-12).[9] Jamestown replied to LaShip, offering ideas on ways to accelerate the work and informing LaShip that it would come with added costs. (Rec. Doc. 102-

---

[9] LaShip's email corresponding to Jamestown states: "EJ, We have a hard delivery date of 15 March. I need to know if you have any problems finishing the boat by that date. If so, list the issues so that we can work together to make it happen." (Rec. Doc. 102-12).

13). In an internal email, LaShip states it told Jamestown to pursue all its suggested ideas to keep the vessel on schedule. *Id.* ("I told [Jamestown] to pursue all of his suggestions to keep us on schedule."). From the exhibits submitted, it appears that the parties agreed to acceleration efforts at additional costs.

Next, it is undisputed that Jamestown submitted change orders and project impact invoices to LaShip, that have remained unpaid. After the vessel was delivered to Viking, LaShip's CEO decided that no payments should be paid to Jamestown for its work on the vessel. (Rec. Doc. 102-19) ("No one should approve any invoices to pay JAMESTOWN for work on VIKING MISSISSIPPI. If you receive any request for payment of invoices send to me."). LaShip then submitted its own invoices to Jamestown. (Rec. Doc. 85-19).

Additionally in support of bad faith, Jamestown includes an email exchange between LaShip and Staco. Staco is a foreign manufacturer of parts used aboard the vessel. Jamestown is Staco's exclusive U.S.A. dealer. In the exchange, LaShip, without going through Jamestown, emailed Staco, requesting the price and lead time for parts. (Rec. Doc. 102-32, at 2). Staco replied that purchasing for any project in the U.S.A. should go through Jamestown. *Id.* at 1. LaShip responded "That's not how we do business. Are you saying [Staco] [doesn't] want any more business from Chouset companies?" LaShip followed up with another email stating

> On jobs that go through [Jamestown] we will be excluding [S]taco from our scope. Our group includes Chouset, [Bollinger], and Halter shipyards, as well as our Brazilian shipyard. You need to consider what

you are doing. If that is your choice we will advise Jamestown that
[S]taco can no longer be used as a supplier to our ten shipyards.

*Id.* This email exchange is dated January 12–13, 2023, after delivery of vessel and
during the time frame LaShip and Jamestown dispute amounts owed.

All of this is to say, the Court finds factual issues remain as to whether LaShip
exercised good faith in its dealings with Jamestown.

### ii. Open Account. Detrimental Reliance, Quantum Meruit, and Unjust Enrichment

LaShip argues that Jamestown has neither a contractual nor a statutory right
to pursue attorney's fees. (Rec. Doc. 85-1, at 40). In Counterclaim Two–Claim
Pursuant to Open Account Statute, Jamestown, in part, seeks recovery of reasonable
attorney fees for the prosecution and collection of such invoices Jamestown alleges
have not been paid. (Rec. Doc. 5). LaShip argues that there is a $414,715 discrepancy
between Jamestown's written demand letter dated October 17, 2022 and the amount
it now claims is correct. (Rec. Doc. 85-1, at 40). Thus, since Jamestown failed to send
a "written demand. . .correctly setting forth the amount owed" pursuant to La. Stat.
Ann. 9:2781(A), LaShip argues Jamestown's request for attorney's fees fails as a
matter of law. *Id.* at 41–42.

Jamestown also filed against LaShip counterclaims eight and nine,
detrimental reliance and quantum meruit, respectively. (Rec. Doc. 5, at 26–27).
Jamestown alleges these counterclaims with respect to its acceleration efforts.
LaShip argues these non-contractual claims are foreclosed by "the unambiguous

terms of the fixed-price contract and Jamestown's failure to satisfy the elements of these equitable remedies." (Rec. Doc. 107, at 6).

With respect to LaShip's motion for summary judgment on Jamestown's counterclaims pertaining to the open account statute, detrimental reliance, and quantum meruit, the Court finds that several genuine issues of material fact and/or law remain after a thorough review of the parties' arguments.

Lastly, Jamestown filed Counterclaim Ten–Unjust Enrichment against River 1, arguing River 1 has been unjustly enriched by the work performed by Jamestown on the vessel. (Rec. Docs. 5, 39). The Court finds there is no genuine issue of law or material fact on this issue and that Counterclaim Ten should be dismissed. Unjust enrichment, an equitable doctrine, is only permitted in the absence of a contract. *T.L. James & Co. v. Traylor Bros. Inc.,* 294 F.3d 743, 747 (5th Cir. 2002). Jamestown's remedy is against LaShip, not River 1.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that the Plaintiffs' *Motion for Partial Summary Judgment* (Rec. Doc. 85) is **GRANTED IN PART** as it pertains to Counterclaim Ten–Unjust Enrichment. The motion is otherwise **DENIED**.

New Orleans, Louisiana, this 23rd day of May, 2025.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE